now working towards the law. Scott Stanley, United States Department of Justice. Please be seated. I'm trying to make sure we can see our colleague, Judge Lagoa, before we get started. Good morning. Good morning, Bill. Let me, I'm trying to find IT to help me. I'm having an issue right now. Hold on. We briefly saw you. Good morning. I think you can see me now. Yes, we can. Thank you. Okay. Thank you. I apologize. So, we're here this morning to hear Nance versus the Commissioner. Counsel, we're familiar with your briefs and your arguments. You don't need to educate us about the background of the case. We have limited time this morning, so you can feel free to get straight to the heart of your argument. We'll probably have some questions. Do pay attention to the traffic lights. When the red light shines, it's time to wrap it up. If you're answering a question from the court, though, you can finish your answer without losing any rebuttal time if that's something that applies to you. So, Mr. Lopez Delgado, would you like to please come speak with us? Good morning, Your Honors, and may it please the Court. My name is Andres Lopez Delgado, and I'm here on behalf of Plaintiff Appellant Michael Nance. Mr. Nance did not receive a fair trial below. The trial court's unprecedented deviations from procedural and evidentiary rules and its misapplication of foundational law prejudiced Mr. Nance and warrant reversal by this court. I want to address the following points today. First, the trial court below conducted proceedings outside the bounds of basic rules. The court permitted defendant's expert, Dr. Joseph Antonini, to examine Mr. Nance for the first time the morning of trial, months after the close of discovery, and to testify on the results later that day from the stand. Do I have it correct that the judge, though, asked your side, do you want to depose him informally? Do you want to file any supplemental reports, and you said no? Yes, Your Honor. Mr. Nance's team moved for exclusion, and on the morning of trial, the court made clear that it thought that any prejudice to the plaintiff was minimal and could be cured during the course of trial. The court did offer a menu of options that included a conversation on or off the record with Dr. Antonini before his testimony or a— That happened, right? Yes, Your Honor. That conversation. Okay. Go ahead. Yes. Over lunch on the first day of trial. Mm-hmm. Yes. And can I just confirm also that the part of the examination was for the doctor to observe the veins, your client's veins? Yes, Your Honor. That was part of the examination. Thank you. Yes, Your Honor. Dr. Antonini performed a physical examination the morning of trial over plaintiff's objection. The exam, as we understand it, consisted of manipulating Mr. Nance's arms without a tourniquet, raising and lowering his arm, and feeling some of his veins without applying traction to them. To be clear, Your Honors, all of this should have happened months ago during discovery. The rules are clear that to prevent trial by ambush, the parties must receive fair notice of the expert's opinions and the basis for those opinions in a written report, needs to have the opportunity to depose them, needs to have the opportunity to decide in dispositive motions practice whether to seek exclusion based on methodology or some other basis under Rule 702. So, can I just get maybe clarification about something? When the judge said, presumably, at least implicitly, I recognize this is unorthodox, and so again, to your team, do you want a formal deposition? Do you want to file supplemental reports of the sort you were saying, this is why it should have been done earlier? And so when your side says no, could your side have said yes? Your Honor, it was Mr. Nance's team's view that the menu of options that the court laid out at the start of trial was in no way sufficient to cure the prejudice. Our understanding from the court's opening remarks was the prejudice here is minimal and should be cured during the course of trial, which Plaintiff's Counsel's team understood to mean the four days for which trial was set. So a brief pre-testimony conversation, which Plaintiff's Counsel did take the court up on, was in no way a substitute for what defendants had with respect to Dr. Weissel's testimony. Well, let's answer Judge Newsom's question, which was there was an offer to be able to do a deposition and to have an expert report, which was declined by Mr. Nance's lawyers. What more could earlier examination have done that that offer would not have also allowed to be done? I'm at a loss to understand that. The court offered the opportunity to do a brief deposition of Dr. Antonini during trial, and so that would have put the Plaintiff's team in the position of deciding whether to seek exclusion on the basis of that deposition midstream when Plaintiff's Counsel had been prepared for months to attack Dr. Antonini's testimony.  Why would you exclude your own deposition? I mean, the point of the deposition, I assume, would have been discovery, and if you found something in the course of the deposition that changed the game, you could have gone to the district court and said, this is what's happened in the deposition. Here's why we need this, or here's why we need this record, or here's why we need why. I don't understand that. Your Honor, Plaintiff's Counsel did take the court up on the opportunity to speak to Dr. Expert and see what they could do to try and mitigate some of the harm that the courts and run around the rules produced. But, Can I, Counsel, I guess I'm sort of befuddled because, you know, this is not something that happens with frequency, but it's not unusual to have in the middle of trial a witness that comes up and a deposition occurs in the middle of trial during lunch hour, and the person then testifies. I mean, this happens with frequency, so it's not like some unusual procedure that the district court judge all of a sudden just created out of thin air. Well, Your Honor, I do think it's important to focus on the fact that this is expert discovery governed by Rule 26, and what Rule 26 requires specifically for expert witnesses is a written report and deposition to occur during the discovery period months before trial to prevent trial by ambush. The court said at the opening that sometimes confirmatory exams do happen much closer to trial or during trial, but that's very different than what we have here, which was a first-time examination, presumably under Rule 35, although that wasn't clear. And so, we certainly weren't able to find any trials conducted in an analogous way to what happened here. Am I correct? I thought I also understood the record to reflect that your own expert also examined your client's veins that morning. Yes. Mr. Nance's team made the decision that if Dr. Antonini was going to be permitted to examine Mr. Nance's veins for the first time the morning of trial, it was necessary for Dr. Wiesel to also examine him in order to be at less of a disadvantage than Mr. Nance otherwise would have been. But Dr. Wiesel, unlike Dr. Antonini, had examined Mr. Nance twice during discovery, had submitted a report in which he discussed his examination, had been deposed on that report months before trial. Well, let me ask you this. I don't understand what difference it makes at the end of the day because it appears to me that the district court did not rely on Dr. Antonini's testimony about that examination. The district court relied on the medical records and its findings that there would not be difficulty in obtaining intravenous access. So it seems to me that even if there were error where you would have to, it seems to me, show an abuse of discretion, that even if there were an abuse of discretion hard standard for you to meet, any error would be harmless. So I am happy to talk some about the medical records and the role that that played in the decision. What I want to know about this is this in reference to Dr. Antonini's testimony that you claim was trial by ambush. The district court described in the background his testimony but never credited it. It just was descriptive. And then when it's actually making its conclusions of law, its references are to the medical records and not to that testimony. So I just don't see where it makes any difference. Two points in response to that, Your Honor. First, I think it's clear in reading the trial court's decision when it's describing Dr. Wiesel's testimony and Dr. Antonini's testimony and the findings of fact, it is crediting Dr. Antonini and using his testimony arising from the courthouse examination to counterbalance the testimony that Dr. Wiesel gave. In the scenario where trial proceeded as it should have and Dr. Antonini was not permitted to examine Mr. Nance for the first time at trial, there would have been only one person testifying at trial, expert or otherwise, who had formed an opinion about Mr. Nance's testimony and agreed was the critical factual issue to be developed at trial. And that would have been Dr. Wiesel. So the court clearly thinks that Dr. Antonini's testimony arising from the examination counterbalances or balances Dr. Wiesel's testimony. But didn't the district court judge really focus part of the rationale, the reasoning for his decision was based on the three procedures that your client had, where he received IVs in his veins? One was a colonoscopy, one was an MRI, and I think another one was a contrast. So the second point I wanted to make on that, on the focus on the medical records, is the court was very clear at trial and said a few times, you know, that the court, the judge is not a doctor. The judge is relying on the testimony of the medical experts who testified at trial to understand what's going on in the record and what's going on with Mr. Nance medically. And Dr. Antonini did reference the reports and talked about the reports, I'm sorry, the medical records in his testimony. And the district court clearly is at least, you know, crediting the testimony about that and the testimony that had there been a problem with intravenous access, it would have showed up on the reports in disagreement with your client's expert. And the district court is clearly crediting one over the other. It has nothing to do with that morning's examination, by the way. Nothing. And so what the district court is doing in crediting that and then relying on the medical records, it seems to me from the district court's order, that's the basis for its ruling. I will respectfully have to disagree on the import of the same day examination. I do think that fundamentally changed Dr. Antonini's credibility, which, yes, the court was crediting Dr. Antonini's testimony, but for this examination, Dr. Antonini would have arrived at his opinion about the state of Mr. Nance's veins and the sufficiency of these records without... Dr. Antonini, insofar as the testimony we're talking about is his testimony that, hey, if there had been a problem with intravenous access, that's something that you would have seen in these records from his three earlier procedures, and you don't. I don't see how that has anything to do with enhanced credibility from having examined the veins that morning. By being able to examine the veins that morning and then testify in the results of the examination, Dr. Antonini was able to represent to the court, and it was the first thing he said when he got on the stand, I have examined Mr. Nance's veins and that's... I understand that, but when he's talking about the medical records from earlier procedures, that's a totally separate issue. He's a medical expert, and the court can say, you know, that makes sense to me. I believe you, that that's the sort of thing that would have showed up on the medical records had there been difficulty in obtaining intravenous access. It doesn't appear there. That doesn't have anything to do with that morning's examination. It does fundamentally affect his credibility. If Antonini had not examined your client the morning of the trial and then had gotten on the stand and said, here's what the medical records show, there were three procedures, no problems, would you say that the district court couldn't rely on him to interpret those medical records? I would say that it would be error for the court to credit Dr. Antonini's testimony on the medical records. If Dr. Antonini had not examined Mr. Nance, it's unclear what value would be added to what's already in the medical records, given that he's essentially basing his opinion solely on. Well, so I mean, it seems to me like you've got kind of like a double-barreled sort of evidentiary problem. One, the medical records themselves. They might just speak for themselves. Maybe you don't need anybody on the stand to sort of interpret them. They just say, as a matter of fact, there were three procedures, no problems. And then now you've got a doctor on the stand who, whether he testified that morning or whether he examined your client that morning or not, he is, in fact, a doctor who reads medical records. And now he gets on the stand and says, this is, in fact, what the medical records say. They say what you think they say. So, I mean, it just seems, and you're asking us, I think, effectively to say that it was clear error for the district court to make that factual finding that indeed there were three prior procedures that caused no problem. Yes, Your Honor, it was clear error for the court to rely on those records and on Dr. Antonini's testimony, which was necessarily impacted by his ability to examine and confirm his opinions through a courthouse examination of Mr. Nance that Mr. Nance received essentially no adequate time to prepare for. Dr. Wiesel gave a much more in-depth, in both his report and in his testimony, treatment of these medical records. Again, with the benefit of having examined Mr. Nance multiple times during discovery. And what is clear from that testimony is that these medical records, which the court relied on through the lens of Dr. Antonini, show that IV access was eventually obtained to the degree necessary to carry out procedures that are fundamentally different in purpose and intent from an execution and under conditions that are very different than those that obtain in execution settings. And Dr. Wiesel also pointed out that they are missing critical information about a number of attempts made, where on the body, whether there were any complications associated with that. And the point I want to emphasize, Your Honor, is that Dr. Wiesel did affirmatively testify in his report and on the stand that that is information that even if there were no complications should be there. And Dr. Antonini testified on the stand that he understood Dr. Wiesel's summary of what was in the reports to be accurate. So... Can I ask you a question, though? In the district court's order, he talks about how it's your burden to show that your client suffered significant discomfort regarding those IVs and failed to proffer any medical records which would show that there was problems obtaining IV access with regards to the three medical procedures. How do you address that, that you provided no evidence of your client suffering any discomfort from those procedures? Our burden at trial, Your Honor, was to show that conditions that exist at Georgia executions were such, and the state of Mr. Nance's veins were such, that carrying out a lethal injection procedure for Mr. Nance in execution settings was going to put him at substantial risk of There's a feasible alternative method that substantially reduces that risk of harm. That is the case that Mr. Nance focused on, was put forward the most relevant evidence possible, which was testimony from a medical expert who had actually examined his veins and considered Georgia's lethal execution protocols and conditions that existed at execution. So, Mr. Nance's... Here's the problem. Your client had three earlier procedures where there was intravenous access. The burden of proof is on you, not on the state. And I think what Judge Lagoa is asking is, you failed to prove that there was ever any difficulty from these earlier procedures, didn't you? Your Honor, I would agree there is not evidence... Offer no evidence that there is, there had been any difficulty in those earlier procedures. Isn't that true? That's correct, Your Honor. Yeah. Yes. Can I ask you to follow up on something you said earlier? You said something, and I don't mean to put words in your mouth, but I think you said something like, yes, but those earlier procedures were different in purpose and intent. I don't think I understand how that matters. Yes, Your Honor. So, I was pointing out that the medical procedures carried out on Mr. Nance in the two years leading up to the execution. The purpose of IV access was, one, for the colonoscopy, to perform the colonoscopy. And the IV access there would have been established for a slow drip of fluid, very different mechanically from an excision. But that's not true. A colonoscopy, they give you an IV to put you out. I mean, it's not, you're not having an IV like that. I mean, an IV is to put you out. That's what they're putting in it for the colonoscopy. So, in this case, Your Honor, the declaration accompanying that medical record said that the nurse was putting Mr. Nance under conscious sedation. And Dr. Wiesel indicated in his report in a trial, and this was not rebutted by the state, that this type of procedure would typically be accomplished through a drip method. So, a much slower rate of IV access, or I'm sorry, of IV fluid entering Mr. Nance's body. So, very different from execution settings. The other way in which these procedures. But it's still an IV access that's going into your veins. It's not like a central line. So, Mr. Nance argued and put forward evidence at trial, both that IV access would be difficult to obtain in the first instance. It might result in painful complications in accessing his veins. And then also, even after IV access is maintained, that the flow rate through the tubing could result in a blown vein, resulting in extravasation, which is painful. So, the point I was making, Your Honor, is that the colonoscopy would present a much lower risk of that happening. And with respect to all these procedures, one fundamental way in which they differ, and why these records are of limited utility in telling the court what might happen at executions, is that a fundamental monitoring function that's typically performed by medical, or always performed by medical professionals in a clinical setting, is gauging the resistance in the IV tubing. And that's being performed at Georgia executions by corrections officers, one of whom testified anonymously at trial to say that they received no training on how to gauge resistance in IV tubing, what to do if something goes wrong. And Dr. Wiesel testified that that is a critical early indicator of something going wrong. Even after IV access is obtained, that IV access is being successfully maintained. So that is a fundamental and critical difference in the lethal injection setting that's simply not true of the procedures carried out from Mr. Nance in the preceding years. And that's why Mr. Nance put forward evidence at trial focused on conditions as they exist at Georgia executions, which are very different from the clinical settings in which Mr. Nance had IV access eventually obtained for the purpose of these other procedures. And even if, taking a step back, because we've talked a lot about the court's order and what the court relies on, the court also misapplied foundational law in its treatment of Mr. Nance's  The court purported to apply the Bayes-Glossop test, which the Supreme Court clarified in Bucklew is a necessarily comparative exercise. And the reason it's necessarily comparative is because the Supreme Court has said that what the court is supposed to be doing is deciding whether... The problem for you with that is our own precedence. And look, you have to prove two things, right? You have to prove both the substantial risk and the lesser alternative, basically. And you've got to satisfy both of those to win. The state only has to disprove one. Or to rebut you on one, beat you on one. And if you didn't establish the first, then there's no point in doing the second. So looking at Bucklew, which is the lens that the court is supposed to apply in assessing whether Mr. Nance has met his burden, the court summarizes the Bayes-Glossop test in its entirety as the plaintiff needs to put forward evidence of a feasible and readily available alternative method that in fact reduces a substantial risk of severe pain under the state's preferred method. So certainly the state will put forward the evidence it puts forward, but when the court is applying its analytical lens to the evidence on the record... How can an alternative reduce a substantial risk of severe pain if there is no substantial risk of severe pain in the first place? Well, the court can't make that determination in a vacuum. That's clear from Bucklew. That's not true. That can't be true. I mean, if the court says there's no substantial risk of severe pain here, it's not required, is it, to go and say, oh, well, is there an even more painless way of killing this individual? Your Honor, I do think that that is what Bucklew... That's your argument, isn't it? That is what Bucklew requires. If there is evidence about the risk of pain with the state's preferred method and evidence put forward with regard to the plaintiff's proposed alternative method, the court has that evidence before it. The court needs to, in determining whether the state's preferred method creates a substantial risk of severe pain, compare it to the evidence put forward on the preferred method. Otherwise, the court would be doing exactly what Bucklew says the court cannot do. Well, I think I understand your argument. I just fundamentally disagree with it. Judge Lagoa, do you have any questions? Okay. You've saved five minutes for rebuttal. Let's hear from Mr. O'Connell. Your Honor, may it please the court. This appeal presents a narrow, straightforward, and simple issue of clear error review. Nance claims that he can't be executed by lethal injection because his veins are in a condition where IV access will be difficult and where complications will arise. But as we've discussed, the district court rejected that claim based on the medical record showing that Nance has had three recent medical procedures... Is there any reason why y'all didn't give earlier notice that you wanted your physician to examine him the morning of trial? Your Honor, I don't really know the entirety of trial counsel's thinking on pursuing the examination. My understanding is that it was something that was a potential option to pursue, but no definitive decision had been made. So, it wasn't something that was always the plan. But you could have notified the district court and the opposing counsel that you would like to have that option available. Sure, I think that's right. I think that, as the district court pointed out, might have been the better way to do things. But what's important to keep in mind, and I think as the court's already discussed, is it doesn't really impact the outcome of the appeal. And that's true for two reasons. One is that the district court, the abuse of discretion analysis, I don't really think turns on trial counsel's decision, but turns on the options that the district court provided to remedy any potential prejudice. But the second reason, and maybe the more important one, is that this court doesn't even need to get into that issue at all for some of the reasons discussed. One, the district court didn't rely on the examination evidence. Two, even if it did somehow, tangentially or implicitly, it would still be harmless error because the medical records alone would be enough. But three, Nance affirmatively waived this entire examination issue. Now, opposing counsel and Nance in his reply brief, they haven't really argued that they properly preserved their objection. They've more said that, well, we didn't make a better objection, I guess, because it would have been futile. They say that the district court made clear at the outset that it was going to allow the examination. That's just contradicted by the record. I would point this court to document 147 at page 83. That's the first day of trial. This is after the district court said he would allow for the lunch interview. The district court says, and then after you report back to me about that, I'll determine whether or not Dr. Antonini can, eventually when he's called to testify, testify about his exam with Mr. Nance. So, the issue was still very much alive. Nance could have come back and when the district court said, did the lunch interview accomplish what you needed, he easily could have said, no, it didn't, or, you know, we're willing to proceed, but we would ask for exclusion. So, and again, on pages 115 through 116, after Nance represented that further steps would not be necessary, that's when the court formally ruled on the motion. So, I think the waiver takes that issue off the table. I would also just point out there's absolutely no indication in the district court's opinion that it relied on Dr. Antonini's physical exam as a counterbalance to Dr. Wiesel's  When the district court was actually engaging with expert testimony one way or the other, its actual analysis makes that clear. I would point to footnotes seven and eight of the opinion where the district court basically discredits parts of Dr. Wiesel's testimony, but only by reference to Dr. Wiesel's own contradictions in his own testimony. So, there was no need to find any counterbalance against Dr. Antonini. And even on the medical records alone, it's not clear to me that the district court was actually engaging in a battle of experts there instead of just, I think as Judge Newsome mentioned, kind of taking the records as they are and saying, because these don't document complications, and if anything, document the opposite, you couldn't possibly have carried your burden. But of course, even if the court did treat that as a battle of the experts, that had nothing to do with the physical examination. As for the absence of detail in the records, I think Nance is just overlooking that as the court's questions kind of get at. That's really his problem. That's not the defendant's problem. And that's what the district court found. There was certainly nothing clearly erroneous about that approach to the medical records. And the idea that these were just completely different procedures, that doesn't really go to clear error at all. That's kind of nitpicking around the edges. But it is worth pointing out that two of the procedures were specifically for the purpose of delivering an IV contrast to make imaging work. So if the idea is that pentobarbital can't be adequately delivered in Nance's veins, and you've got two procedures specifically for a similar purpose, certainly nothing going toward clear error. And finally, as for whether Bucklew just kind of, without saying so, completely revolutionizes the Bayes-Glossop test, I would point this court to footnote four of Bucklew, where the Supreme Court says, the state also argues that plaintiff's claim fails because he can't show severe pain. But we're not going to reach that because he hasn't even shown an alternative for the pain he alleges. So the Supreme Court is clearly telling everyone, we're not even talking about the first prong. Certainly can't be read as just eliminating it. And Nance's brief likes to say that the Supreme Court earlier in this litigation also applied this sort of comparative test. I would actually point to this panel's decision on remand from the Supreme Court, where you addressed Bayes-Glossop without any suggestion of this sort of comparative analysis and actually held that the pain of needle pricks is not constitutionally impermissible. You reach that holding without any comparison. And under Nance's theory, that holding couldn't possibly be correct because he's arguing that firing squad is literally painless. So the idea that the district court got the legal standard wrong is incorrect. The idea that the district court made any clear error is also incorrect. And I think this court can affirm based on the medical records alone. Can I ask you one question about the remote and anonymous testimony? I know we really didn't get into that with your adversary, but it's briefed. It's before us. So as I read 43, Federal Rules of Civil Procedure 43, that certainly seems to cover the remoteness aspect of this. But it doesn't really seem to bless the anonymous aspect of this. Well, two points, Your Honor. The first is that I think the fact that these execution participants can be anonymous, even for trial purposes, is well established. I don't really think that's subject to genuine debate. And I would point this court to its decision in Jordan, where the court held that revealing the identity of, in that case, the pharmacist, would lead to the pharmacist immediately being hounded by anti-death penalty activists such that the state wouldn't even be able to carry out executions. And I believe that was this court's language, hounded. Yeah, so it's not, I guess my point is, it's not a Rule 43 issue. It's a sort of management of the trial issue. Right. And I think the second point, and where I think it ties into Rule 43, is that Rule 43 allows for, sorry, not anonymous, it allows for remote testimony with good cause and compelling circumstances. And so I think the anonymity point is definitely a good cause or a compelling circumstance, especially here where the entire point of allowing the remote testimony is to protect the anonymity. And on that point, Your Honor, Nance's arguments kind of prove too much and would make Rule 43 a dead letter. His two main arguments are that credibility would be harder to determine and that, at least for some of the witnesses, or at least for all of the witnesses examining counsel couldn't see them. I would just point out, I don't know that difficulty in credibility determinations is even relevant to Rule 43. I think that's just baked in. It will always be true under their reasoning. In every single case, that remote testimony will get credibility. But I understand from the record that the district court judge was able to view them, their face, when they testified. He was allowed to see them. That's right, Your Honor. Yeah, so I think the worries about credibility— He could make the credibility determination because this was a bench trial, correct? Absolutely, that's right. Yeah, but just the idea that it would be somehow harder via video even, that will always be true in remote testimony. So if that makes an abuse of discretion, that would essentially mean Rule 43 can never be  And as for the visibility of the witnesses, the commentary to Rule 43 expressly states that audio-only testimony may be sufficient. Again, if not being able to see the witnesses is an abuse of discretion, that would basically render that commentary a dead letter. So I think the arguments just prove entirely too much on the anonymous witnesses. Any other questions? Thank you, Mr. O'Kelly. Thank you. Ms. Rulopasticado, you save five minutes.  So I'll start from the last point addressed by the panel and work backward from there on the Rule 43 issue under which witnesses were permitted to testify anonymously, remotely, and out of sight of examining counsel. Judge Newsom, as your question pointed out, the court had already taken significant steps to preserve the witnesses' anonymity conforming with the Georgia Secrecy Act, which does not create a federal privilege, but had already determined that Mr. Nance's counsel were not to know the names, addresses, educational background, anything more than the vaguest strokes of their qualifications. So Mr. Nance's counsel had already been deprived of quite a bit of information that would typically be used to test the credibility of critical witnesses at trial, the witnesses who were actually to carry out the execution of Mr. Nance. So having already taken those steps, the court then added on top another layer of remote and out of sight of counsel, which were steps not necessary to preserve the anonymity or public disclosure of information about these witnesses. Those measures had already been taken. It was the state's burden to show good cause in compelling circumstances, and the only thing the state pointed to was the Secrecy Act, which had already been satisfied. So it was an abuse of discretion for the court to add on these additional and unnecessary steps to shield the witnesses from the ceremony of testifying in court, which the advisory committee notes Rule 43 note can have a powerful effect on truth-telling. I think it is clear that credibility is baked into Rule 43. If you look at the advisory committee notes, they emphasize that the opportunity to judge the demeanor of a witness is a court of great value. And so it was prejudicial to Mr. Nance's counsel, significantly so, because Mr. Nance's counsel could not ask follow-up questions based on nonverbal cues or communication that the witnesses might have been giving. We don't know what we didn't see, and it's clear that the court found their testimony credible. The court says that multiple times in its order, and so that was a significant prejudice to Mr. Nance. On Bucklew, my colleague brought up Bucklew footnote 4, which essentially says that because the plaintiff hadn't shown the feasibility and viability of an alternative method, he didn't need to get to prong one, that order of operations is fine. That's what Bucklew expressly contemplates. Bucklew says we begin with the alternative method. The inverse, as Bucklew also makes clear, is not fine. You can't decide in a vacuum without considering whether plaintiff has put forward evidence about the alternative method, whether there's a substantial risk of severe pain with respect to the state's plaintiff. Can I just ask how your theory of Bayes, Glossop, and Bucklew would work? I mean, it sounds like you're envisioning something like what we would call in, like, First Amendment land, like a least restrictive alternative, like a least painful alternative is, like, baked in. No matter how benign, no matter how benign in absolute terms the state's method of execution is, so long as you can come up with something that seems a little bit better, you've always got an Eighth Amendment claim. There's no sort of threshold beneath which the Eighth Amendment doesn't operate? No, Your Honor. I think it is baked into Bayes, Glossop, and Bucklew that the difference that the plaintiff needs to show is a substantial difference. So I'm not suggesting, you know, if there was minimal evidence presented with respect to plaintiff's preferred method, the analysis that the court engages in might not have to be a long and searching analysis, but the comparison has to be made. The court has to consider the evidence and decide whether the difference is substantial. That's not what the court did below. It didn't decide that the difference in risk of pain was insubstantial. It decided it didn't need to reach the evidence presented by Mr. Nansal. Here's what Bucklew says. Bucklew says that the prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain. If you don't have a substantial risk of severe pain in the first place, then there's no need to show the alternative. Your Honor, the way I read Bucklew is that the court starts with the preferred method and can decide that the difference is not substantial for that reason. It doesn't say that there's a substantial difference between the two. The word substantial is with respect to the risk of severe pain. It's not requiring a finding about how substantially one compares to the other. It's saying it will reduce what would be a substantial risk of severe pain. And in response to that, Your Honor, I'd say that elsewhere in Bucklew, the court makes clear that what the courts are trying to determine is whether the state's preferred method super adds pain. And that is inherently comparative. Can't decide whether a method super adds pain over an alternative without looking at the proposed alternative. Okay. Thank you. I think we understand your case. And we're going to be in recess until this afternoon. All rise. Thank you.